**Craig HIMES, et al., Plaintiffs,**

v.

**Louis W. SULLIVAN, M.D., et al., Defendants.**

**Civ. No. 91–6172L.**

United States District Court, W.D. New York.

Sept. 4, 1991.

Ellen M. Yacknin, Greater Upstate Law Project, Rochester, N.Y., David B. Pels,

Southern Tier Legal Services, Bath, N.Y., for plaintiffs.

Brian M. McCarthy, Asst. U.S. Atty., U.S. Atty., Rochester, N.Y., for defendant Louis W. Sullivan, M.D.

Charles D. Steinman, Office of New York State Atty. Gen., Dept. of Law, Rochester, N.Y., for defendant Cesar Perales.

James A. Robinson, Rochester, N.Y., for defendant W. Burton Richardson.

Thomas S. Pera, Buffalo, N.Y., for defendant Karen Schimke.

Gary Lee Bennett, Wayne County Dept. of Social Services, Lyons, N.Y., for defendant Rita B. Otterbein.

H. Bartlett McGee, Jr., Warren County Dept. of Social Services, Lake George, N.Y., for defendant Joseph P. Menaldino.

Martha A. Rogers, County of Suffolk, Dept. of Law, Hauppauge, N.Y., for defendant Ruth A. Brandwein, Ph.D.

## DECISION AND ORDER

LARIMER, District Judge.

Plaintiffs, suing on behalf of themselves and all similarly situated Medicaid applicants and recipients throughout New York State, ask this Court to enjoin the defendants from counting as "available income" court-ordered support payments and mandatory payroll deductions in determining Medicaid eligibility. This matter is before the Court on plaintiffs' motion for a preliminary injunction and for class certification.[1]

For the reasons that follow, I must deny plaintiffs' motion for a preliminary injunction.

## BACKGROUND

The named plaintiffs in this action are Medicaid applicants or recipients who have been informed that their benefits will be reduced or discontinued because their available income, including taxes and court ordered support payments, exceeds allowable limits. Prior to January 1, 1991, amounts that a plaintiff was ordered to pay in child support were deducted automatically by the State in the calculation of the payor's monthly income. Likewise, amounts that a plaintiff had deducted from his or her salary for the payment of income and FICA taxes were not included as income.

### A. *Statutory Framework.*

Medicaid, enacted in 1965 as Title XIX of the Social Security Act, 42 U.S.C. § 1396 *et seq.*, is a jointly financed federal-state program designed to provide medical assistance to those who lack sufficient income and resources to pay for health care. A state is not required to participate in the Medicaid program. Once a state chooses to participate in the program, however, it must create a state plan that complies with the requirements imposed by the Medicaid Act and the federal Medicaid regulations.

States participating in the program must provide Medicaid coverage to the "categorically needy." 42 U.S.C. § 1396a(a)(10)(A); *Atkins v. Rivera,* 477 U.S. 154, 106 S.Ct. 2456, 91 L.Ed.2d 131 (1986). The "categorically needy" are persons eligible for cash assistance under either the SSI program, 42 U.S.C. § 1381 *et seq.,* or the AFDC Program, 42 U.S.C. § 601 *et seq.* Notably, SSI and AFDC are intended to provide financial assistance for basic necessities, but are not designed to cover medical expenses. Consequently, Congress directed participating states to provide medical assistance, through the Medicaid program, to these individuals who would otherwise be unable to meet their medical expenses. *Schweiker v. Gray Panthers,* 453 U.S. 34, 37, 101 S.Ct. 2633, 2636, 69 L.Ed.2d 460 (1981).

A participating state also may elect to provide medical benefits to the "medically needy." The "medically needy" are individuals who satisfy the eligibility requirements of AFDC or SSI but whose income exceeds the maximum income levels permitted under the various cash assistance programs. *Atkins,* 477 U.S. at 157, 106

---

1. Defendants do not oppose plaintiffs' motion for class certification. Moreover, after reviewing the facts in this case, I find that class certification under Fed.R.Civ.P. 23(b)(2) is warranted. Accordingly, the Court hereby certifies a plaintiff class to include all New York State Medicaid applicants and recipients.

S.Ct. at 2458. These individuals qualify for benefits under Medicaid only after they incur expenses that reduce their income to the eligibility level of a "categorically needy" person. In other words, the medically needy must "spend down" the amount by which their income exceeds the eligibility level, so that their income matches the income of persons eligible for AFDC or SSI. *Atkins*, 477 U.S. at 158, 106 S.Ct. at 2459.

Most states promptly elected to participate in the Medicaid program, and many chose to provide coverage to the "medically needy." By 1967, however, Congress realized that it was "fiscally improvident to rely exclusively on the states to set income limits for both aspects of the Medicaid program." *Schweiker v. Hogan*, 457 U.S. 569, 575–76, 102 S.Ct. 2597, 2602, 73 L.Ed.2d 227 (1982). Consequently, in 1968, Congress enacted section 1396b(f)(1)(B), which limits federal financial participation in the Medicaid program. This section provides that the "applicable income limitation with respect to any family is the amount determined, in accordance with standards prescribed by the Secretary, to be equivalent to 133⅓ percent of the highest amount which would ordinarily be paid to a family of the same size without any income or resources."

In 1982, Congress amended § 1396a of the Medicaid statute to require states to use "the same methodology" for the medically needy as would be employed for the categorically needy. *See* Tax Equity and Fiscal Responsibility Act of 1982 ("TEFRA"), Pub.L. No. 97–248 (1982). The Secretary interpreted TEFRA to require states to use the same disregards and deductions in determining financial eligibility for the medically needy as those utilized in the AFDC and SSI cash assistance programs. In response, Congress in 1984 enacted a moratorium that prohibited the Secretary from imposing penalties and disapproving state plans that used less restrictive eligibility criteria than the AFDC and SSI methodologies. *See* Deficit Reduction Act of 1984 ("DEFRA"), Pub.L. No. 98–369, § 2373(c)(1), 98 Stat. 494, 1112 (1984).

In reply to the Secretary's narrow interpretation of the 1984 moratorium, Congress passed additional legislation in 1987 to clarify its intent. *See* Medicare and Medicaid Patient and Program Protection Act of 1987 ("MMPPPA"), Pub.L. No. 100–93, § 9, 101 Stat. 680, 695 (1987). The Medicare Catastrophic Coverage Act of 1988 made this moratorium permanent by allowing states to be less restrictive, but not more restrictive, than the AFDC and SSI methodologies. 42 U.S.C. § 1396a(r)(2).

Section 1396a(r)(2) provides, in relevant part:

> The methodology to be employed in determining income and resource eligibility for [medically needy] individuals ... may be less restrictive, and shall be no more restrictive, than the methodology [employed in determining eligibility under the State plan most closely categorically related].

To determine whether a person is entitled to Medicaid benefits, a state may consider only the income and resources that are "available" to the applicant or recipient. 42 U.S.C. § 1396a(a)(17)(B). It is this statute, and the interpretation of "available" income, that is at the heart of the dispute in the instant case.

### B. *The New York State Plan.*

New York State participates in the Medicaid program and has elected to provide Medicaid benefits to the "medically needy." Prior to January 1, 1991, New York used an income methodology for the medically needy that expressly disregarded court-ordered support payments and mandatory payroll deductions in the calculation of countable income. In other words, New York automatically excluded court-ordered support payments and mandatory payroll deductions for income taxes in determining Medicaid eligibility. *See* former N.Y. Social Service Law, §§ 366.2(a)(5) and 366.-2(a)(7).

In September 1985, the New York State Department of Social Services ("NYSDSS") submitted State Plan Amendment ("SPA") 85–25 to the federal Health Care Financing

Administration ("HCFA") for approval. The SPA contained a proposed list of income disregards, including those at issue in this case. Thereafter, in March 1989, and prior to a final determination on SPA 85–25, the HCFA issued and sent to the State Medicaid Manual ("SMM"), Transmittal No. 33.[2] According to the Secretary, this transmittal describes HCFA's policy on the use of the so-called "more liberal disregards," and provides in relevant part:

> Section 303(e) of the Medicare Catastrophic Coverage Act (MCCA) of 1988 adds § 1902(r)(2) [§ 1396a(r)(2)] to the Medicaid statute. Under this new section, you may employ, for all Medicaid only eligibility groups ... income and resource methods that are more liberal than those of the most closely related cash assistance program.... Exempted from the definition of more liberal policies are those which result in rendering current eligibles ineligible. Because Federal Financial Participation (FFP) limits under § 1903(f) [§ 1396b(f)] remain unchanged, application of more liberal income methods under color of § 1902(r)(2) to those eligibility groups which are subject to § 1903(f) limits might result impermissibly in these limits being exceeded.

Then, on April 3, 1989, the Administrator of the HCFA notified NYSDSS that SPA 85–25 had been partially disapproved. In particular, the Administrator informed the State that New York's income exemptions for payroll withholdings and court-ordered support payments were disallowed. The April 3, 1989 letter from HCFA to NYSDSS explained:

> We also noted in our review of [SPA 85–25] that more liberal deductions for income taxes, FICA, and court ordered support payments were previously incorrectly approved as part of SPA 82–9. We also noted that listed as an approved more liberal disregard under SPA 82–9 is a disregard of health insurance premiums in addition to federally mandated deductions (ie., under regulations at 42

C.F.R. § 435.831). To the extent that these are not deductions required under this regulation, application of the disregards can result in Federal financial participation (FFP) limits being exceeded. Approval of these additional disregards, however, does not allow the State to claim FFP for services rendered to any individual or family whose income exceeds the FFP limits in section 1903(f). Therefore, the States should remove these policies from its approved plan.

In order to bring New York's plan into compliance with the Secretary's directives, the New York State Legislature amended New York's Medicaid statute in December 1990. *See* Chapter 938, § 38 of the Laws of 1990. The Legislature deleted income taxes and court ordered support payments as specific income exemptions, effective January 1, 1991. *Id.; see* former N.Y.Soc. Serv.Law, § 366.2(a)(7).

On December 31, 1990, the NYSDSS notified the various county social service departments of this change in a form administrative letter ("ADM"). The letter stated that "the mandatory payroll deductions and court ordered support payments are being eliminated as income exemptions. The exceptions will be described in the forthcoming ADM." NYSDSS claims that new regulations were promulgated on an emergency basis on May 1, 1991. They were to be implemented prospectively, only after actual notice was given to individual applicants and recipients.

### C. *The Parties' Contentions.*

Plaintiffs allege three grounds for the granting of preliminary injunctive relief. First, plaintiffs contend that the Secretary's interpretation of "available income" to include court-ordered support payments and mandatory payroll deductions contravenes the plain language of 42 U.S.C. § 1396a(a)(17)(B), and should be enjoined. In plaintiffs' view, the language of § 1396a(a)(17) is unambiguous and prohib-

---

**2.** On September 26, 1989, the Secretary issued proposed regulations that include, in substance, the language of Transmittal No. 33, and that

implement fully the eligibility provisions discussed in the SMM. *See* 54 Fed.Reg. 39421.

its states, and the Secretary, from including these items in the calculation of countable income because such income is not "actually available" to the Medicaid applicant or recipient. Plaintiffs also claim that the Secretary's current interpretation conflicts with the legislative history of the statute, as well his prior interpretation, which was contemporaneous with the enactment of the Medicaid law. Plaintiffs maintain that the Secretary's current interpretation differs from his longstanding position of excluding these items from available income.

As to the second ground for relief, plaintiffs allege that the State failed to give advance public notice of the changes in New York's countable income rules as required under the Medicaid regulations. Finally, plaintiffs assert that the State violated federal regulations by failing to consult with a properly constituted Medical Care Advisory Committee ("MCAC") regarding implementation of the State's new rules.

The Secretary argues in response that the Medicaid Act and its legislative history provide no basis for plaintiffs' restrictive notion of "available income." The Secretary contends that the plain language of § 1396a(a)(17)(B) does not preclude states from counting court-ordered support payments and mandatory payroll deductions in the calculation of available income. That section, according to the Secretary, is intended by Congress to guard against the false attribution of unrealized income from one person to another. Furthermore, argue defendants, under the test of *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984), the Secretary's rational interpretation of the federal statute is entitled to substantial deference, since the plain language of § 1396a(a)(17) does not speak directly to this issue.

Next, the State contends that the federal notice provision relied upon by plaintiffs is inapplicable in this case. Finally, the State asserts that it complied with all relevant federal regulations in seeking the advice of the MCAC, but that the MCAC failed to respond with any recommendations.

# DISCUSSION

## A. *Standard of Review.*

When a court reviews an agency's construction of a statute it is confronted with two questions. First and foremost, is the question whether Congress has *directly* spoken to the precise matter at hand. *Chevron,* 467 U.S. at 842, 104 S.Ct. at 2781. "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.,* at 842–43, 104 S.Ct. at 2781. If, however, the court decides that Congress has not directly addressed the precise question at issue, the court may not simply impose its own construction on the statute. *Id.* "Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.*

Moreover, the Secretary's construction of 42 U.S.C. § 1396a(a)(17) may not be disturbed as an abuse of discretion if it reflects a *plausible* construction of the statute and does not otherwise conflict with Congress' expressed intent. *See Rust v. Sullivan,* —— U.S. ——, 111 S.Ct. 1759, 1767, 114 L.Ed.2d 233 (1991); *Chevron,* 467 U.S. at 844, 104 S.Ct. at 2782. More importantly, in determining whether the Secretary's construction is permissible, this Court "need not conclude that the agency construction was the only one it could permissibly have adopted ... or even the reading the court would have reached if the question initially had arisen in a judicial proceeding." *Chevron,* 467 U.S. at 843 n. 11, 104 S.Ct. at 2782 n. 11.

■ In reviewing the Secretary's interpretation, the Court must accord substantial weight to HHS' construction of a statute that it is entrusted to administer. In fact, "courts must exhibit particular deference to the Secretary's position with respect to legislation as intricate as [the Medicaid statute]." *DeJesus v. Perales,* 770 F.2d 316, 327 (2d Cir.1985), *cert. denied,* 478 U.S. 1007, 106 S.Ct. 3301, 92

L.Ed.2d 715 (1986). Mindful of these limitations, this Court must therefore follow the Secretary's construction of § 1396a(a)(17)(B) unless I find that it conflicts with unambiguous Congressional intent or is not "a permissible construction of the statute." *Chevron*, 467 U.S. at 843, 104 S.Ct. at 2782.

B. *The "Availability" Principle.*

1. Statutory Analysis and Legislative History of 42 U.S.C. § 1396a(a)(17).

■ The Court's first task is to determine if Congress has addressed precisely in 42 U.S.C. § 1396a(a)(17)(B) whether a state is *required* to disregard a Medicaid recipient's court-ordered support payments and mandatory payroll withholdings in calculating available income. I conclude that Congress did not. 42 U.S.C. § 1396a(a)(17)(B) requires that a state plan for medical assistance:

> include reasonable standards ... which ... provide for taking into account only such income and resources as are, as determined in accordance with standards prescribed by the Secretary, available to the applicant or recipient and ... as would not be disregarded ... in determining his eligibility for such aid, assistance, or benefits.

I find that this section does not speak directly to the principal issue raised in this case, namely whether these items *must* be excluded from the calculation of a Medicaid recipient's monthly income. The plain language of the statute makes no mention of court-ordered support payments or mandatory payroll deductions. Nor is the term "available" income defined anywhere in the Medicaid statute. Although Congress clearly could have defined "available income," it expressly determined *not* to do so. Instead, section 1396a(a)(17)(B) explicitly confers upon the Secretary exceptionally broad authority to give substance to the meaning of the term "available." *See Herweg v. Ray*, 455 U.S. 265, 274, 102 S.Ct. 1059, 1066, 71 L.Ed.2d 137 (1982).

Moreover, the Supreme Court's interpretation of the "availability principle" lends support to the Secretary's construction of § 1396a(a)(17). While the Court has not addressed the precise question at issue in this case, it has stated that the "availability principle" is aimed primarily at preventing states from imputing or assuming financial assistance from sources who have no obligation to furnish it. *See Heckler v. Turner*, 470 U.S. 184, 200, 105 S.Ct. 1138, 1147, 84 L.Ed.2d 138 (1985); *Schweiker v. Gray Panthers*, 453 U.S. 34, 45, 101 S.Ct. 2633, 2641, 69 L.Ed.2d 460 (1981). In light of these Supreme Court precedents, section 1396a(a)(17) is fully capable of supporting the Secretary's view that Congress intended the principle of "availability" to guard against the imputation of unrealized income from one person to another.

Having concluded that the plain language of the statute does not impose a requirement that these items must be excluded from income, it is necessary to consider whether the Secretary's policy of *including* these items in the calculation of income violates the intent of Congress in providing for Medicaid benefits. Plaintiffs argue that Congressional intent to exclude these items from income is unmistakable. In their view, the legislative history indicates that only income *actually available* to, or in the hands of, a Medicaid recipient may be considered in the calculation of countable income. In my opinion, however, the legislative history of the statute supports the Secretary's view that by using the word "available" Congress intended merely to guard against the false attribution of unrealized income.

For example, a 1965 Senate Report summarizing the newly enacted Medicaid Act stated:

> Another provision is included that requires States to take into account only such income and resources as (determined in accordance with standards prescribed by the Secretary), are actually available to the applicant or recipient and as would not be disregarded.... Income and resources taken into account, furthermore, must be reasonably evaluated by the States. *These provisions are designed so that the States will not assume the availability of income* which

may not, in fact, be available or overevaluate income and resources which are available. *Examples of income assumed include support orders from absent fathers, which have not been paid or contributions from relatives which are not in reality received by the needy individual.*

S.Rep. No. 404, 89th Cong., 1st Sess. 78, *reprinted in* 1965 U.S.Code Cong. & Admin.News 1943, 2018; H.R.Rep. No. 213, 89th Cong., 1st Sess. 67 (1965) (emphasis added).

Plaintiffs rely upon this same 1965 Senate Report, and contend that it necessarily follows from this legislative history that Congress intended to exclude court-ordered support payments and mandatory payroll deductions from countable income. Plaintiffs read too much into the history of this provision. Contrary to plaintiffs' contentions, this legislative history seems to indicate Congress' concern about the "deeming" or "imputing" of income between relatives, which was a prevalent state practice at the time. To limit this problem, Congress added the principle of "actual availability" to the statute.

Further support for the Secretary's construction of § 1396a(a)(17) may be found in the House Budget Committee Report on the Omnibus Budget Reconciliation Act of 1987. The House Report on the 1987 OBRA discussed the Committee's reasons for advocating the "less restrictive methodology" language that would eventually be codified at § 1396a(r)(2). This Report, which listed examples of less restrictive methodologies that states *could* establish, furnishes strong support for the Secretary's position that § 1396a(a)(17) does not *require* states to exempt court-ordered support payments and mandatory payroll deductions from the calculation of available income. The House stated:

> The following examples, by no means exhaustive, illustrate less restrictive methodologies that States *could* establish in their medically needy programs under the Committee amendment.... *A State could treat income used to make family support payments (pursuant to*

> *a court order [or] agreement with a District Attorney) as unavailable to the payor for purposes of determining income eligibility.*

H.Rep. No. 100–391(I), 100th Cong., 1st Sess. 1, 505 (1987), *reprinted in* 1987 U.S.Code Cong. & Admin.News 2313–1, 2313–325 (emphasis added).

Clearly, if Congress had specifically intended court-ordered support payments to be mandatorily excluded, it would *not* have listed this item as one that a state *could* choose to establish as a less restrictive methodology. This language indicates that participating states have the *option* of implementing this less restrictive methodology, but certainly are not *required* to do so.

In support of their view of "actual availability," plaintiffs point to a House Budget Committee Report on the Omnibus Reconciliation Act of 1986 ("OBRA"). In 1986, the House of Representatives passed an amendment to clarify the counting of income and resources of an individual who is in an institution. The House Report on the 1986 OBRA summarized this amendment as follows:

> The Committee finds the [Secretary's] position untenable. The Committee fails to understand how income which must, by law, be used for the support of someone other than the Medicaid beneficiary can be "available" to him or her. The very purpose of a requirement at section 1902(a)(17)(B) of the Act that States take into account only such income and resources as are available is to prevent them from including in income the actual amounts that an applicant or beneficiary is legally compelled to use for someone else's support....

H.Rep. No. 99–727, 99th Cong., 2d Sess. 109–10, *reprinted in* 1986 U.S.Code Cong. & Admin.News 3607, 3699–3700.

However, the Senate did not consider this issue and the House amendment was explicitly *not* included in the final version of the 1986 OBRA. *See* H.Conf.Rep. No. 1012, 99th Cong., 2d Sess. 223, 399, *reprinted in* 1986 U.S.Code Cong. & Admin.News 3868, 4044 ("The conference

agreement does not include the House bill.") Defendants contend that Congress' failure to enact the House amendment supports their interpretation of "available income." Plaintiffs disagree and claim that Congress' failure to pass the amendment stemmed from its belief that such income was already excluded by statute. *See Emerson v. Wynia*, 754 F.Supp. 705, 709 n. 4 (D.Minn.1991), *appeal pending*.

In my opinion, there is no basis for plaintiffs' assertion that Congress failed to pass this amendment because it believed this item was previously excluded by statute. Plaintiffs have not cited, nor has the Court found, any legislative history to support this view. More importantly, in revisiting the Medicaid Act in 1986 Congress demonstrated its awareness of the Secretary's interpretation, but nevertheless chose *not* to amend § 1396a(a)(17)(B). This failure by Congress to reject HHS' construction of § 1396a(a)(17)(B) is significant, and I find that as a result deference to the Secretary's interpretation is "particularly appropriate" in this case. *See C.B.S., Inc. v. F.C.C.*, 453 U.S. 367, 382, 101 S.Ct. 2813, 2823, 69 L.Ed.2d 706 (1981).

Indeed, such deference is especially fitting where, as here, Congress is aware of the agency's interpretation but "has not acted to correct any misperception of its statutory objectives." *Id.* It is well established that "congressional failure to revise or repeal the agency's interpretation is persuasive evidence that the interpretation is the one intended by Congress." *Young v. Community Nutrition Institute*, 476 U.S. 974, 983, 106 S.Ct. 2360, 2366, 90 L.Ed.2d 959 (1986) (quoting *NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 275, 94 S.Ct. 1757, 1762, 40 L.Ed.2d 134 (1974)); *see also United States v. Rutherford*, 442 U.S. 544, 554 n. 10, 99 S.Ct. 2470, 2476 n. 10, 61 L.Ed.2d 68 (1979) (Once an agency's statutory interpretation has been " 'fully brought to the

attention of the public and the Congress,' and the latter has not sought to alter that interpretation although it has amended the statute in other respects, then presumably the legislative intent has been correctly discerned.")[3]

2. Case Law.

The Secretary's interpretation of the legislative history of § 1396a(a)(17) is further buttressed by the Supreme Court's decisions in *Heckler v. Turner*, 470 U.S. 184, 105 S.Ct. 1138, 84 L.Ed.2d 138 (1985), and *Schweiker v. Gray Panthers*, 453 U.S. 34, 101 S.Ct. 2633, 69 L.Ed.2d 460 (1981). While not directly on point, the Court in *Turner* and *Gray Panthers* analyzed the "availability principle" and found that it is aimed primarily at preventing states from imputing or assuming financial assistance from sources who have no obligation to furnish it.

For example, in *Turner*, the Court held that mandatorily withheld payroll deductions were "available" income to AFDC recipients. *Turner* traced the origins of the availability principle to congressional consideration of the Social Security Act of 1939. 470 U.S. at 200–01, 105 S.Ct. at 1147. In construing the legislative history of the Social Security Act, as well as the AFDC regulations, the *Turner* Court disagreed with the Ninth Circuit's interpretation of the principle of "actual availability." The Supreme Court observed that:

> Contrary to the conclusion of the Court of Appeals, the principle of actual availability has not been understood to distinguish the treatment of tax withholdings from that of other work expenses. Rather, it has served primarily to prevent the States from *conjuring fictional sources of income and resources by imputing financial support from persons who have no obligation to furnish it* or by overvaluing assets in a manner that at-

---

**3.** In any event, the Court rejects plaintiffs' attempt to attach great weight to the language in the 1986 House Budget Committee Report. "[T]he views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one." *Consumer Product Safety Commission v. GTE Sylvania, Inc.*, 447 U.S. 102, 117–18,

100 S.Ct. 2051, 2061, 64 L.Ed.2d 766 (1980). Likewise, "subsequent legislative history will rarely override a reasonable interpretation of a statute...." *Id.*, at 118 n. 13, 100 S.Ct. at 2061 n. 13. This subsequent legislative history is far from a reliable means of determining Congress' intent in enacting § 1396a(a)(17) in 1965.

tributes non-existent resources to recipients.

470 U.S. at 200, 105 S.Ct. at 1147 (emphasis added); *see also Deel v. Jackson*, 862 F.2d 1079 (4th Cir.1988) ("The availability principle is simply not the clear-cut statutory rule of 'literal availability' that the plaintiffs claim.")

The Court in *Turner* concluded that the purpose of the availability principle clearly "is to prevent the States from relying on imputed or unrealizable sources of income artificially to depreciate a recipient's need." 470 U.S. at 201, 105 S.Ct. at 1147; *see, e.g., King v. Smith*, 392 U.S. 309, 319–20, 88 S.Ct. 2128, 2134, 20 L.Ed.2d 1118 (1968).

Likewise, in *Gray Panthers*, the Supreme Court expressly rejected the notion that use of the term "available" in § 1396a(a)(17)(B) demonstrates that Medicaid entitlement must be determined on the basis of income actually in the hands of the recipient. 453 U.S. at 47, 101 S.Ct. at 2642. Instead, the Court found that "[i]t is clear beyond doubt that Congress was wary of imputing the income of others to a Medicaid applicant." [4] *Id.* It should be noted, however, that the decision in *Gray Panthers* focused on the question whether the term "available" could include the income of a spouse under 42 U.S.C. § 1396a(a)(17)(D). The Court found that the Secretary's regulations properly permitted the "deeming" of income between spouses.

In any event, the Supreme Court in *Gray Panthers* noted the explicit, and exceptionally broad, delegation of authority that Congress conferred on the Secretary in § 1396a(a)(17)(B). It then concluded that "the Secretary's definition of the term 'available' is entitled to more than mere deference or weight." 453 U.S. at 43–44, 101 S.Ct. at 2640 (citation omitted). Because Congress entrusted the primary re-

sponsibility of interpreting this statutory term to the Secretary rather than to the courts, his definition is "entitled to 'legislative effect.'" *Id.* at 44, 101 S.Ct. at 2640; *see also Herweg v. Ray*, 455 U.S. 265, 274–77, 102 S.Ct. 1059, 1066–67, 71 L.Ed.2d 137 (1982).

Although the Supreme Court's decisions in *Turner* and *Gray Panthers* dealt with different matters than those at hand, the Court's interpretation of the availability principle is compelling.

Plaintiffs, on the other hand, rely principally on two decisions for the proposition that federal Medicaid law prohibits a state agency from including court-ordered support payments—and by analogy, mandatory payroll deductions—in the calculation of countable income. *See, e.g., Department of Health, State of California v. Secretary of HHS*, 823 F.2d 323 (9th Cir.1987) ("*DHS*"); *Emerson v. Wynia*, 754 F.Supp. 705 (D.Minn.1991), *appeal pending*.

The Ninth Circuit's decision in *DHS*, also relied on by the court in *Emerson*, is distinguishable from the instant case. *DHS* involved an appeal by the State of California from a decision of the Secretary rejecting the State's proposed Medicaid plan amendments. On appeal, the Secretary contended that Medicaid procedures for calculating available income were required to "mirror" those set forth in the SSI Act and its regulations. 823 F.2d at 327. The Court of Appeals rejected this argument that the "same methodology" provision of the Medicaid statute required states to follow federal SSI rules. The court in *DHS* also noted that "income that a Medicaid recipient uses to pay court-ordered child support or alimony cannot be used to reduce the recipient's Medicaid benefits." 823 F.2d at 328. *DHS*, however, contains no analysis of § 1396a(a)(17), its legislative history or the principle of "actual availability."

4. Significantly, in rejecting the argument that "available" means income actually in the hands of a recipient, the Court cited some of the same legislative history that plaintiffs' rely upon in this case. *See, e.g.,* 453 U.S. at 47, 101 S.Ct. at 2642 (citing S.Rep. No. 404, 89th Cong., 1st Sess., 78 (1965) (States may "not assume the availability of income which may not, in fact, be available"); 111 Cong.Rec. 15804 (1965) (remarks of Sen. Ribicoff) ("only income and resources actually available to an applicant may be considered in determining need")). However, the Supreme cited this legislative history to note Congress' wariness concerning the imputation of income of others.

In any event, because the court held that states did not have to follow SSI rules in fashioning state plans for Medicaid, "the discussion in *DHS* concerning whether child support and alimony payments constitute income for SSI eligibility purposes is *merely dicta.*" *Martin v. Sullivan,* 932 F.2d 1273, 1277 (9th Cir.1990) (emphasis added). Moreover, the Ninth Circuit in *Martin* found that *DHS* "do[es] not create a broad 'actual availability' principle that is to be applied to every case determining what constitutes 'income'...." *Martin,* 932 F.2d at 1277. Thus, even the Ninth Circuit does not consider *DHS* to be binding precedent on the scope of the availability principle.

As to *Emerson v. Wynia,* I respectfully disagree with that court's analysis of § 1396a(a)(17) and its legislative history. In my view, neither the statute nor Congressional intent plainly support plaintiffs' position.

In sum, I find that while the language of § 1396a(a)(17)(B) itself is silent as to the question whether court-ordered support payments and mandatory payroll deductions *must* be excluded from countable income, the legislative history supports the Secretary's construction of the statute that he is not prohibited from *including* them in determining Medicaid eligibility. Turning then to the next step in the *Chevron* analysis, the Court must assess the rationality of the Secretary's interpretation of the Medicaid Act.

### 3. The Secretary's Interpretation.

█ The Secretary argues that § 1396a(a)(17) does not require, as plaintiffs contend, a state to exempt the items at issue here from the calculation of countable income. While a state *may* choose to disregard some or all of these items under other provisions of the Medicaid statute, namely § 1396a(r)(2), it is not required to do so under § 1396a(a)(17)(B). The Secretary claims that his policy reflects both the flexibility of § 1396a(r)(2), which allows states to adopt income disregards more liberal than those permitted in the cash assistance programs, and the income cap of § 1396b(f), which limits federal participation in the Medicaid program. Under this policy, if a state opts for the more liberal disregards under authority of § 1396a(r)(2) that income must still be considered in determining compliance with the limits established by § 1396b(f).

In my view, the Secretary's construction of §§ 1396a(a)(17), (r)(2) and b(f) in this instance represents a permissible interpretation of those statutes. It does not have to be the *only* interpretation, but merely a permissible one. As noted above, neither § 1396a(a)(17) nor its legislative history mandates the exclusion of these items. That the challenged interpretation is certainly plausible is clear from a review of the legislative history of § 1396a(r)(2), which permanently codified the 1984 moratorium. In passing the Medicare and Medicaid Patient and Program Protection Act of 1987, Congress addressed the Secretary's restrictive interpretation of the 1984 moratorium. The Senate Report states:

> The provision [ie. § 1396a(r)(2)] only intends to permit States to broaden Medicaid eligibility by changing the rules under section 1396a(a)(10) and (17) that govern income and resource eligibility of individuals not receiving cash assistance. *Medicaid eligibility cannot be broadened by changing other Medicaid requirements. For example, the moratorium does not eliminate the limits on income and resources of eligible individuals and families under section 1396b(f)* (including the requirements that the applicable medically needy income level not exceed the amount determined in accordance with standards prescribed by the Secretary to be equivalent to 133⅓% of the most generous AFDC eligibility standard....)

S.Rep. No. 109, 100th Cong., 1st Sess., 24–25 (1987) *reprinted in* 1987 U.S.Code Cong. & Admin.News 682, 705 (emphasis added).

The legislative history of § 1396b(f) reveals that the basic purpose of the 133⅓% income restriction was to limit Federal financial participation in the Medicaid program. The Senate Report to the Social

Security Amendments of 1967 contains telling language of Congress' intent:

> The committee has followed the development in the medical assistance program with *deep concern* over its rising costs. The tendency of some States to identify as eligible for medical assistance under title XIX large numbers of persons who could reasonably be expected to pay some, or all, of their medical expenses has not only significantly increased the amount of Federal funds flowing into this program currently but has developed further cost projections of a level totally inconsistent with the expectation of Congress when it enacted title XIX in 1965.

S.Rep. No. 744, 90th Cong., 1st Sess. 3013 *reprinted in* 1967 U.S.Code & Admin.News 2834, 3013 (emphasis added).

By enacting § 1396b(f) Congress thus evidenced a clear intent to prevent the dissipation of Medicaid resources. Furthermore, in referring to the income limits of § 1396b(f) in the 1987 "moratorium" legislation, Congress expressed its intent to provide states with the opportunity for flexibility while at the same time maintaining limits on Federal financial participation.

Finally, the legislative history of the Omnibus Budget Reconciliation Act of 1987, which was enacted only months after the MMPPPA, provides further support for the Secretary's interpretation of § 1396a(a)(17). As noted above, the House Budget Committee Report on the 1987 OBRA discussed the Committee's use of the "less restrictive methodology" language, which was to be codified at § 1396a(r)(2). The House listed examples of less restrictive methodologies that states *could* establish in their medically needy programs. For example, "[a] State *could* treat income used to make family support payments (pursuant to a court order [or] agreement with a District Attorney) as unavailable to the payor for purposes of determining income eligibility." H.Rep. No. 100–391(I), 100th Cong., 1st Sess. 1, 505 (1987), *reprinted in* 1987

U.S.Code Cong. & Admin.News 2313–1, 2313–325 (emphasis added).

If Congress had intended court-ordered support payments to be *mandatorily* excluded, it would not have listed this item as one that a state *could* choose to establish as a less restrictive methodology. In light of this legislative history, I find that the Secretary's interpretation is both plausible and permissible.

That the Secretary's interpretation is reasonable is also evident from its consistency with the SSI and AFDC statutes and regulations. Generally, SSI and AFDC serve as the basis for determining Medicaid eligibility. Notably, these cash assistance programs do *not* prohibit states from including court-ordered child support, income tax and other mandatory payroll deductions from the payor's income. For example, the SSI statute defines "income" as "both earned income and unearned income." 42 U.S.C. § 1382a(a). "Unearned income" is further defined as "all other income." 42 U.S.C. § 1382a(a)(2). Under 42 C.F.R. § 416.1123, the SSI regulations state what amount of unearned income is then considered as income. In pertinent part, this section of the regulation provides that:

> We may include *more or less* of your unearned income than you *actually receive*....
>
> (2) We also include more than you actually receive if amounts are withheld from unearned income because of a garnishment, or to pay a debt or *other legal obligation*, or to make any other payment such as payment of your Medicaid premiums....
>
> (3) ... We do not subtract from any taxable unearned income the part you have to use to pay *personal income taxes*. The payment of taxes is *not* an expense you have in getting income.

42 U.S.C. § 416.1123(b) (emphasis added).[5] *See also Peura v. Munson,* 1990 WL 259679 (D.Alaska August 13, 1990) (finding

---

5. The Social Security Administration recently amended § 416.1123(b)(2). *See* 56 Fed.Reg. 3209–3212 (effective January 29, 1991). The provision cited above contains the amended language, which makes explicit longstanding agen-

cy policy to include as income "monies withheld from an individual's income by garnishment, child support payments (both court ordered and voluntary), and other payment of debts." *Id.*

that in light of § 416.1123, it is "reasonable for the Secretary to not allow deductions for tax withholding").

Similarly, the AFDC regulations grant states the *option,* subject to the state's need standard, of allocating or setting aside income an individual must pay for support. *See* 45 C.F.R. § 233.20(a)(3)(ii)(C). That regulation specifically provides that "[s]tates *may* have policies which provide for allocating an individual's income for ... the support of other individuals living in the same household ... and for the support of other individuals living in another household." *Id.*

4. Deference to Administrative Interpretation.

Finally, I address plaintiffs' argument that the Secretary's "new" interpretation of "available income" is entitled to little or no deference because it reverses a longstanding agency policy that excluded court-ordered support payments and mandatory payroll deductions from income, and thus represents a sharp break from the Secretary's prior construction of the Medicaid statute. Plaintiffs contend that the agency's prior interpretation, which was issued contemporaneously with the statute, is entitled to substantial weight. Plaintiffs charge the Secretary with doing an about-face in disapproving New York's Medicaid Plan in April 1989.

The Secretary maintains that there has been no change of interpretation with respect to the income disregards at issue here. Moreover, even if the Secretary's present policy is viewed as a change, it represents an evolving interpretation, not a "sharp break," and may be amply justified as a permissible construction of the statute.

Generally, administrative interpretations of statutes are accorded the greatest deference when promulgated contemporaneously with the enactment of the law. Because the Secretary's current interpretation is different from his previous position (i.e. the 1982 approval of New York's state plan amendment), it must be analyzed carefully. Nevertheless, the agency's interpretation

here is clearly still entitled to deference because of its rationality. *Rust v. Sullivan,* —— U.S. ——, 111 S.Ct. 1759, 1769, 114 L.Ed.2d 233 (1991).

In any event, the Supreme Court "has rejected the argument that an agency's interpretation 'is not entitled to deference because it represents a sharp break with prior interpretations' of the statute in question." *Rust,* 111 S.Ct. at 1769 (quoting *Chevron,* 467 U.S. at 862, 104 S.Ct. at 2791). Indeed, a revised interpretation deserves deference because " 'an initial agency interpretation is not instantly carved in stone' and 'the agency to engage in informed rulemaking, must consider varying interpretations and the wisdom of its policy on a continuing basis.' " *Rust,* 111 S.Ct. at 1769 (quoting *Chevron,* 467 U.S. at 863–64, 104 S.Ct. at 2792). It is well settled that an "agency is not required to establish rules of conduct to last forever." *Id.* (citations omitted). Rather, the agency must be given ample latitude to alter rules and policies *to meet the demands of changing circumstances. Id.*

Thus, even if the Secretary's evolving interpretation is viewed as a "sharp break" with the past, I find that the Secretary amply justified his change of interpretation with a "reasoned analysis." *Id.* The Secretary's policy was published and distributed to the States in March 1989. *See* SMM Transmittal No. 33; 54 Fed.Reg. 39421 (September 26, 1989). This notice discussed the Secretary's interpretation of § 1396a(r)(2) and the use of more liberal income disregards. The Transmittal, and later the Proposed Regulations, explained that these additional disregards were nonetheless still subject to the federal financial participation cap set forth in § 1396b(f). The Secretary also determined that this "new" interpretation was in keeping with the recent Congressional enactment of § 1396a(r)(2). I believe that the Secretary's justifications are sufficient to support his interpretation.

Mindful of the limits to this Court's review of an agency's construction of statutory provisions that it is entrusted to administer, I conclude that the Secretary's

interpretation of § 1396a(a)(17) is a permissible, reasonable construction of Congress' intent. I decline, therefore, to substitute my judgment for the Secretary's.

## C. Adequate and Timely Notice.

Plaintiffs allege next that implementation of the State's new countable income rules must be enjoined because the State failed to provide adequate and timely notice of its changes in the countable income rules, as mandated by the public notice requirements of 42 C.F.R. § 447.205. Defendants maintain that this regulation does not apply to plaintiffs, but instead requires only that NYSDSS give advance notice of changes in payment rates to Medicaid *providers*.

■ Although full compliance with the advance public notice requirements of § 447.205 is generally required, there exists an exception for "certain legislatively mandated agency action." *California Ass'n of Bioanalysts v. Rank*, 577 F.Supp. 1342, 1348 (C.D.Cal.1983). Where, as here, the change was caused by the legislature, rather than by an agency's interpretation of the law, the detailed public notice requirements are often rendered unnecessary. *See, e.g., Rank*, 577 F.Supp. at 1348; *Claus v. Smith*, 519 F.Supp. 829, 833 (N.D.Ind.1981).

In *Rank*, the court observed that the rationale for this legislative exception is:

[C]hanges mandated by a legislature "have already gone through a public process," 46 Fed.Reg. 58,679 (1981), and, as a result, the objectives of the notice requirements—ie., to secure public comment and to promote accountability among decisionmakers—already have been satisfied in the legislative process. Moreover, several of the requirements specified in § 447.205 would be inappropriate in the context of ministerial actions undertaken by agencies implementing the commands of a legislature.

577 F.Supp. at 1348.

Similarly, in *Claus v. Smith*, 519 F.Supp. 829 (N.D.Ind.1981), the court stated that where "no interpretation or discretion [is] required of [an agency] by a given state statute" then full compliance with the notice publication requirements of 42 C.F.R. § 447.205 is not mandated. *Id.*, at 833; *see also Seniors United for Action v. Ray*, 529 F.Supp. 55 (N.D.Iowa 1981), aff'd, 675 F.2d 186 (8th Cir.1982) (where any harm that accompanied a failure to comply with the § 447.205 was remedied by the giving of subsequent notice).

■ In the instant case, the newly enacted state law does not require interpretation or discretion by NYSDSS. Rather, the New York statute simply eliminates the exclusion for court-ordered support payments and, with respect to mandatory payroll deductions, provides that "[n]o other income or resources, including ... payroll deductions, whether mandatory or optional, shall be exempt...."

Moreover, there is evidence in the record before me that NYSDSS attempted to publish new administrative regulations but was requested by plaintiffs' counsel not to issue the ADM. Additionally, defendants have shown that plaintiffs received actual notice of the change in countable income rules. Where, as here, "the party has received actual notice of the proposed changes and therefore is able to adjust his behavior or make comments to the same degree as he would have had the notice provisions been fully satisfied, full compliance with § 447.-205 will not be required." *Rank*, 577 F.Supp. at 1350; *see also United States v. Aarons*, 310 F.2d 341 (2d Cir.1962) ("If a person has actual notice of a rule, he is bound by it. The only purpose of the requirement for publication in the Federal register is to make sure that persons may find the necessary rules ... if they seek them. It goes without saying that actual notice is the best of all notices.")

Plaintiffs' reliance on this Court's decision in *Doe v. Perales*, 782 F.Supp. 201 (1991), is misplaced. In *Doe*, this Court enjoined the State for failing to provide advance public notice, timely actual notice, and because the notice that was provided was not adequate under 42 C.F.R. § 435.-919. However, plaintiffs in this case have

received timely actual notice and public notice was apparently not sent at the request of plaintiffs' counsel. Moreover, the Court in *Doe* found that the newly enacted state law did not directly mandate a $350 reduction in the exempt resource limit; but, rather, the State interpreted the legislation to require that reduction. In contrast, this Court finds that the statutory provisions at issue here do not vest discretion in the hands of the NYSDSS with respect to interpreting the amount of court-ordered support payments and mandatory payroll deductions that may be excluded from income. The instant case is, therefore, distinguishable from the Court's decision in *Doe.*

Accordingly, I find that plaintiffs have failed to establish a likelihood of success on the merits of their claim that the State did not provide adequate and timely public notice of the change in countable income rules.

### D. *Consultation with the Medical Care Advisory Committee.*

█ Plaintiffs also contend that NYSDSS violated federal Medicaid regulations by failing to consult with a properly constituted Medical Care Advisory Committee ("MCAC") prior to the implementation of changes in the State's countable income rules. Plaintiffs argue that defendants' breach entitles them to preliminary injunctive relief. For its part, NYSDSS responds that it advised the MCAC of the proposed changes in income exemptions and invited comment, but no comments were ever received. It was only then that the NYSDSS filed new regulations concerning the changes in the State's Medicaid countable income rules. Defendant Sullivan adds that in any event the presence or absence of consultation with the MCAC cannot cause plaintiffs irreparable harm since the MCAC is merely an advisory body lacking authority to issue legally binding opinions.

A state electing to participate in the Medicaid program is required to establish a medical care advisory committee as a condition of its participation. 42 C.F.R. § 431.-12(b). New York State has created such a committee pursuant to N.Y.Soc.Serv.Law § 365–c. The federal regulations provide that the role of the MCAC is "to advise the Medicaid agency about health and medical care services." 42 C.F.R. § 431.12(a); *see also* N.Y.Soc.Serv.Law § 365–c. Specifically, the MCAC "must have opportunity for participation in policy development and program administration, including furthering the participation of recipient members in the agency program." 42 C.F.R. § 431.-12(e).

In my view, the record amply demonstrates that NYSDSS complied with the consultation requirements of § 431.12. The State has shown that on March 18, 1991, NYSDSS sent MCAC members a draft of the proposed regulations, an impact statement and "flexibility analysis exception," which discussed NYSDSS' plan to implement the Legislature's elimination of certain income exemptions. Further, NYSDSS provided each MCAC member with a stamped, self-addressed envelope, and requested his or her comments on the contemplated changes as soon as possible. The State contends that no response or advice was ever issued by the MCAC. NYSDSS filed the new countable income regulations six weeks *after* MCAC was advised of the proposed changes.

I find that in this case MCAC was provided with an opportunity for "participation in policy development," as well as "to advise the Medicaid agency about health and medical care services." Moreover, MCAC was sufficiently apprised of the problems and issues here. *See Benton v. Rhodes,* 586 F.2d 1, 3 (6th Cir.1978), *cert. denied,* 440 U.S. 973, 99 S.Ct. 1539, 59 L.Ed.2d 791 (1979). Because the regulations establish only an advisory role for MCAC, "[i]t was not necessary for the state officials to obtain the consent of the Committee to the reduction of the optional benefits." *Id.*

Plaintiffs' reliance on *Morabito v. Blum,* 528 F.Supp. 252 (S.D.N.Y.1981), and *Becker v. Toia,* 439 F.Supp. 324, 332–33 (S.D.N.Y.1977), is misplaced. In *Morabito,* MCAC was not consulted either before or after the change in question. In *Becker,* there was no functioning MCAC for over

three years. Twenty members were to have been appointed to the committee but only six had actually received an appointment. As a result, the *Becker* Court concluded that there was no MCAC even in existence to consult.

Plaintiffs also argue that New York State's MCAC was not properly constituted until June 27, 1991, when a Medicaid recipient was added to the Committee. 42 C.F.R. § 431.12(d)(2) states that MCAC must include:

> Members of consumers' groups, including Medicaid recipients, and consumer organizations such as labor unions, cooperatives, consumer-sponsored prepaid group practice plans and others.

Plaintiffs allege that MCAC was not properly constituted because the Committee lacked a Medicaid recipient. It is unclear, however, whether there were other members of "consumers' groups" on the MCAC. Plaintiffs do not claim that this group was completely unrepresented. If there were "consumers" on the Committee, then the requirements of § 431.12 may have been satisfied. *See Burgess v. Affleck*, 683 F.2d 596, 601 n. 9 (1st Cir.1982) ("We do not hold that any specific number or percentage of such representatives need be present on the committee.")

Even if the Court were to assume that MCAC was not properly constituted due to the absence of a Medicaid recipient on the Committee, plaintiffs nevertheless are not entitled to an injunction on this ground. In *Burgess*, the Court of Appeals noted that:

> An injunction would cause further delay in bringing medicaid expenditures in line with available federal funding, creating the possibility of an eventual funding shortfall which might drain other, possibly more urgent programs.... While the MCAC did not fully conform in make-up to the regulation, it complied in many respects. Plaintiffs have not shown, moreover, why they could not have contested the composition of the committee before any changes in the state medicaid

> program were made, by seeking a declaratory judgment or otherwise.

683 F.2d at 601.

I find this reasoning wholly persuasive, and hold that the requirement for MCAC participation, while far from ideal, has been satisfied in this case. The New York MCAC conformed in most respects with federal regulations and was given the opportunity to advise and participate in policy development at a time when the State had proposed only draft regulations. Notably, plaintiffs did not contest the composition of the committee at an earlier point in time. The Court therefore concludes that plaintiffs have failed to demonstrate a likelihood of success on the merits of this claim, or that the balance of harms tips decidedly in their favor to compel injunctive relief.

### E. Standards for Preliminary Injunction.

For a preliminary injunction motion to be granted, plaintiffs must demonstrate:

> "(a) irreparable harm and (b) either (1) likelihood of success on the merits, or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief."

*Seaboard World Airlines, Inc. v. Tiger Int'l, Inc.*, 600 F.2d 355, 359–60 (2d Cir. 1979), *quoting Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir.1979).

It is well settled that the decision to grant preliminary injunctive relief falls within the sound discretion of the district court. *Kahn Music v. Baldwin Piano & Organ*, 604 F.2d 755, 758 (2d Cir.1979), *citing, Doran v. Salem Inn, Inc.*, 422 U.S. 922, 931–32, 95 S.Ct. 2561, 2567–68, 45 L.Ed.2d 648 (1975). For the reasons stated above, plaintiffs have failed to demonstrate a likelihood of success on the merits, or sufficiently serious questions going to the merits to make them a fair ground for litigation.

## CONCLUSION

Plaintiffs' motion for a preliminary injunction is denied. Plaintiffs' motion for class certification is granted.

IT IS SO ORDERED.