683 F.2d 596
 Angelina BURGESS, Therese Kirouac, Ian Dowell, Janet
Ducharme, Annie Foote, Margaret Monteiro, Lora
Martino, On their own behalf and on
behalf of all others similarly
situated,
Plaintiffs,
Appellants,
v.
John J. AFFLECK, Individually and in his capacity as
Director of the Rhode Island Department of Social
and Rehabilitative Services, Defendant, Appellee.
 No. 82-1425.
 United States Court of Appeals,
First Circuit.
 Argued June 9, 1982.
Decided July 28, 1982.
 
 Barry Best, Providence, R. I., with whom James H. Hardy, Rhode Island Legal Services, Providence, R. I., was on supplemental memorandum in support of motion for injunction pending appeal, for plaintiffs, appellants.
 Robert J. Fallon, Chief Legal Counsel, Dept. of Social and Rehabilitative Services, Cranston, R. I., with whom Dennis J. Roberts, II, Atty. Gen., and Brian Van Couyghen, Sp. Asst. Atty. Gen., Providence, R. I., were on memorandum of law in opposition to motion for injunction pending appeal, for defendant, appellee.
 Before COFFIN, Chief Judge, CAMPBELL and BOWNES, Circuit Judges.
 LEVIN H. CAMPBELL, Circuit Judge.
 
 
 1
 Plaintiffs are Rhode Island Medicaid recipients who have brought procedural challenges to certain cuts in benefits made by the state of Rhode Island following a reduction in federal funds. The district court granted a preliminary injunction with respect to reductions not here at issue,[1] but it denied such relief with respect to cuts in ambulance, optometry, and podiatry services,[2] on the ground that plaintiffs had failed to demonstrate a likelihood of success on the merits. Plaintiffs' motions for an injunction pending appeal were denied by both the district court and this court. While we affirm the denial of the preliminary injunction as within the district court's discretion, see, e.g., Massachusetts Coalition of Citizens with Disabilities v. Civil Defense Agency, 649 F.2d 71, 74 (1st Cir. 1981), we also note our stricter view of the federal requirements concerning the composition of the state's Medical Care Advisory Committee ("MCAC").
 
 Background
 
 2
 "Medicaid" is the cooperative federal-state medical assistance program established by Title XIX of the Social Security Act, 42 U.S.C. §§ 1396 et seq. Federal funds are made available to states with medical assistance plans meeting federal statutory and regulatory requirements. See 42 U.S.C. §§ 1396, 1396a; 42 C.F.R. Subchapter C, Parts 430-456. Changes in the program, including a reduction in federal funding, were made in the Omnibus Budget Reconciliation Act of 1981 ("OBRA"), Pub.L.No.97-35, 95 Stat. 357, which was signed into law on August 13, 1981. Federal funds for the 1981-1982 fiscal year were generally reduced by three percent. See OBRA § 2161(a), 95 Stat. 803. Because Rhode Island adopted a qualified hospital cost review program, its funds were reduced by only two percent. See id. This resulted in a loss to the state of approximately $2,000,000 in federal funds.
 
 
 3
 Rhode Island's preparation for the anticipated OBRA medicaid cuts began well before the statute was enacted. A memorandum within the Department of Social and Rehabilitative Services ("SRS") dated July 28, 1981 set forth a "worst case" scenario and several options for various reductions in state medicaid expenditures to make up for the loss of federal funds. Federal regulations implementing the OBRA medicaid changes[3] were published on September 30, 1981. 46 Fed.Reg. 47,976, 47,996. It was not until this time, therefore, that SRS officials knew the precise nature and extent of the changes wrought by OBRA. Policy development within SRS evidently continued into December, at which time Rhode Island's hospital cost review program was approved, resulting in a decrease in its federal funding reduction, see supra. On December 22, the department's proposed medicaid reductions were forwarded to the governor. After various meetings, the governor approved the proposals on January 13, 1982. On January 25, the SRS published a notice of the proposed changes.
 
 
 4
 Up until this point, Rhode Island's MCAC-a committee established under a federal regulation[4] to advise the state on medicaid issues-had not been consulted about any of the proposed changes or other alternatives. On January 28, letters were sent to all MCAC members advising them of a meeting to be held on February 4. At that time, a representative of SRS met with the committee, explained the proposed changes, and heard comments and suggestions. A public hearing pursuant to the Rhode Island Administrative Procedures Act, R.I.Gen.Laws §§ 42-35-1 et seq., was held on February 18. Another MCAC meeting was held on March 4, at which time changes in the proposed regulations were discussed. See note 13, infra. The final rules were filed on March 10, with an effective date of April 1.[5]
 
 Consultation with the MCAC
 
 5
 Plaintiffs contend that the state failed to involve the MCAC sufficiently early in the process of determining what changes should be made as a result of OBRA. Their argument is based on 42 C.F.R. § 431.12(e), which provides that the state MCAC "must have opportunity for participation in policy development and program administration." They complain chiefly that the committee was not involved at the time when various alternative policy proposals were considered, and, for that reason, was presented only with the opportunity to make minor comments on rules that were essentially already in final form. Defendant responds that the actual effects of OBRA were not known until December, when the state cost review program was approved, which finalized the amount of funds that would be lost. Further, defendant urges that nothing could be done without the governor's approval, and the MCAC was contacted shortly after that. Finally, defendant points out that certain reductions in the proposed cutbacks were made in response to input from the MCAC. See note 13, infra.
 
 
 6
 The district court concluded that plaintiffs had failed to demonstrate a likelihood of success on the merits of this issue, because the MCAC "met on two occasions and did discuss the proposed changes." It thought the scope of the discussions was "pretty much up to" the MCAC itself, so that the meetings which occurred met the requirements of section 431.12(e).
 
 
 7
 Under the regulation, the MCAC should have the opportunity to consider and discuss the available alternative policies, not merely the chance to make minor suggestions concerning a single policy already adopted by the state. See Jennings v. Alexander, (1981-1 Transfer Binder) Medicare & Medicaid Guide (CCH) P 30,735, at 9163-64 (M.D.Tenn. Sept. 3, 1980); Ho v. Chang, (1977 Transfer Binder) Medicare & Medicaid Guide (CCH) P 28,433, at 9526 (D. Hawaii Apr. 27, 1977). Judged by this yardstick, we believe that the MCAC's involvement here was of borderline sufficiency; it would have been more in keeping with the spirit of the regulation had the MCAC been involved at a somewhat earlier stage.
 
 
 8
 Nonetheless, we do not believe the district court abused its discretion in concluding that the committee's involvement was not so attenuated as to warrant enjoining the cuts. The committee's role is advisory only. It has no power to veto proposed changes or to require the state to adopt its suggestions. The cases in which changes have been enjoined have all involved more egregious failures to consult with the MCAC than is present here. In Jennings v. Alexander, supra, for example, the collective advice of the committee was never sought either before or after changes were proposed. Only letters were sent to the individual members of the committee; it never met as a group. In Morabito v. Blum, 528 F.Supp. 252 (1981-2 Transfer Binder) Medicare & Medicaid Guide (CCH) P 31,621 (S.D.N.Y. Nov. 25, 1981), the MCAC was not consulted either before or after the change in question. In Dunn v. Ginsburg, (1981-1 Transfer Binder) Medicare & Medicaid Guide (CCH) P 30,802 (S.D.W.Va. July 23, 1980), and Becker v. Toia, 439 F.Supp. 324 (S.D.N.Y.1977), proper MCAC's were not even in existence. Here, on the other hand, the committee met and did propose changes, which were accepted. There was not such a total failure to consult as would justify prohibiting implementation of the cutbacks.[6] Cf. Seniors United For Action v. Ray, 529 F.Supp. 55 (N.D.Iowa 1981), aff'd, 675 F.2d 186 (8th Cir. 1982).
 
 Composition of the MCAC
 
 9
 Under the federal regulations, set out at the end of this opinion, the MCAC "must include,"
 
 
 10
 Members of consumers' groups, including Medicaid recipients, and consumer organizations such as labor unions, cooperatives, consumer-sponsored prepaid group practice plans and others.
 
 
 11
 42 C.F.R. § 431.12(d)(2). The committee must also include "physicians and other representatives of the health professions who are familiar with the medical needs of low-income population groups," id. § 431.12(d)(1), and the director of the state welfare or health department, whichever is not in charge of the state medicaid agency, id. § 431.12(d)(3). Committee members are appointed by the head of the state medicaid agency or a higher state authority. Id. § 431.12(c). There are no further explicit requirements as to the size of the committee or the relative percentages of members from each represented group.
 
 
 12
 The Rhode Island MCAC consists of 14 persons, including two medicaid recipients; the Director and Executive Director of the state Department of Elderly Affairs and Consumers' Council, respectively; and the Medical Directors-both doctors-of the Rhode Island Group Health Association and the Providence Ambulatory Health Care Foundation. The other members are the Deputy Director of the state Department of Health and seven representatives of various health care provider groups.
 
 
 13
 The district court ruled that plaintiffs did not have a likelihood of success on the merits of their challenges to the MCAC's makeup because "the regulations can fairly be construed to mean that there is a broad discretion in the agency as to who serves" on the MCAC. The court also apparently accepted the proposition that the representatives of state agencies on the committee could qualify as representatives of "consumer organizations" for purposes of the regulation. We disagree with the district court as to this latter proposition, although we do not believe an injunction was required.
 
 
 14
 We do not think that state officials alone, even the head of its Consumers' Council, may satisfy the requirement that members of "consumer organizations such as labor unions, cooperatives," etc., be included on the committee. Regardless of a state agency's good faith and statutory mandate to protect consumers, it does not appear that the regulation contemplates state officials as filling this role at least in the absence of other representatives of consumer organizations. While the enumerated examples-such as labor unions-are not meant to be exhaustive, none are state agencies, indicating at least inferentially that non-governmental groups should be included. Moreover, the purpose of the MCAC seems to be to provide independent input into the process of state decisionmaking. This cannot be accomplished without representatives from outside of state government. Therefore, while we see nothing in the regulation which would prohibit appointment of representatives of relevant state agencies to the committee, we think that one or more members of non-governmental "consumer organizations" must also be included pursuant to 42 C.F.R. § 431.12(d)(2).
 
 
 15
 No other persons on the committee appear to satisfy that requirement. The medicaid recipients are listed in the regulation as members of "consumers' groups," a category apparently distinct from "consumer organizations." While the Rhode Island Group Health Association-a prepaid group practice plan-may have, as defendant asserts, "originally" been consumer-sponsored, no claim is made that it currently is, as seems to be required by the regulation.[7] Similarly, defendant does not claim that the Providence Ambulatory Health Care Foundation meets this requirement.[8] We thus conclude that the Rhode Island MCAC does not meet the requirement of including members of consumer organizations.[9]
 
 
 16
 While the district court erred, therefore, in rejecting this aspect of plaintiffs' objection to the state's actions, we are not convinced that plaintiffs were entitled to an injunction against enforcement of the cutbacks. An injunction would cause further delay in bringing medicaid expenditures in line with available federal funding, creating the possibility of an eventual funding shortfall which might damage other, possibly more urgent programs. Plaintiffs have pointed to no obvious errors, and to no lack of good faith, in the adopted priority of cutbacks. While the MCAC did not fully conform in makeup to the regulation, it complied in many respects. Plaintiffs have not shown, moreover, why they could not have contested the composition of the committee before any changes in the state medicaid program were made, by seeking a declaratory judgment or otherwise.[10] Had they done so, a properly constituted MCAC might have been formed and the medicaid cutbacks made in a proper fashion.[11] By waiting instead to enjoin cuts made by the present MCAC, plaintiffs have much increased the potential detriment to the state. Cf., e.g., New York City v. Pine, 185 U.S. 93, 22 S.Ct. 592, 46 L.Ed. 820 (1902). For these reasons, we are not convinced that the balance of harms tips sufficiently in plaintiffs' favor to compel injunctive relief.[12] See generally Planned Parenthood League v. Bellotti, 641 F.2d 1006, 1009 (1st Cir. 1981) (favorable balance of harms a prerequisite for preliminary injunction).State Administrative Procedures Act
 
 
 17
 Plaintiffs' final argument is that the medicaid rule changes violated the Rhode Island Administrative Procedures Act, R.I.Gen.Laws §§ 42-35-1 et seq. They claim that the notice and comment publication on January 25, 1982 was fatally premature, because the proposed changes were still subject to change in light of the MCAC's input. They argue that it therefore violated R.I.Gen.Laws § 42-35-3(a), which provides in relevant part,
 
 
 18
 Prior to the adoption, amendment, or repeal of any rule the agency shall: (1) give at least twenty (20) days' notice of its intended action. The notice shall include a statement of either the terms or substance of the intended action or a description of the substance and issues involved.
 
 
 19
 (2) afford all interested persons reasonable opportunity to submit data, views, or arguments, orally or in writing....
 
 
 20
 We do not think that plaintiffs have demonstrated a likelihood of success on the merits of this issue. While at the time the notice was given the MCAC had not yet been consulted, the proposed rules here were sufficiently developed so as to give meaningful notice to the public of what action was contemplated by the agency, and to give persons a "reasonable opportunity" to comment thereon. Cf. 1 K. Davis, Administrative Law Treatise § 6:25 (2d ed. 1978). Moreover, the modifications that were made as a result of the committee's input[13] were not so great as to require another round of notice and comment. Cf. BASF Wyandotte Corp. v. Costle, 598 F.2d 637, 642-44 (1st Cir. 1979), cert. denied sub nom. Eli Lilly & Co. v. Costle, 444 U.S. 1096, 100 S.Ct. 1063, 62 L.Ed.2d 784 (1980); South Terminal Corp. v. EPA, 504 F.2d 646, 658-59 (1st Cir. 1974); Pennzoil Co. v. FERC, 645 F.2d 360, 371-72 (5th Cir. 1981), cert. denied, --- U.S. ----, 102 S.Ct. 1000, 71 L.Ed.2d 293 (1982). On these facts, we can perceive no violation of the state Administrative Procedures Act.
 
 Conclusion
 
 21
 For the reasons stated above, we agree that plaintiffs did not demonstrate a likelihood of success on the contentions of insufficient involvement of the MCAC and of violation of the state Administrative Procedures Act. We reverse the district court insofar as it sustained the composition of the MCAC. However, we do not think an injunction against the cuts is equitably compelled. See supra pages 601-602. Plaintiffs bear a heavy burden in seeking relief in this court after a denial of their request for a preliminary injunction by the district court. See, e.g., Walker v. Providence Journal Co., 493 F.2d 82, 87 (1st Cir. 1974). They have not met that burden here.
 
 
 22
 The denial of a preliminary injunction is affirmed.
 
 APPENDIX
 
 23
 § 431.12 Medical care advisory committee.
 
 
 24
 (a) Basis and purpose. This section, based on sec. 1902(a)(4) of the Act, prescribes State plan requirements for establishment of a committee to advise the Medicaid agency about health and medical care services.
 
 
 25
 (b) State plan requirement. A State plan must provide for a medical care advisory committee meeting the requirements of this section to advise the Medicaid agency director about health and medical care services.
 
 
 26
 (c) Appointment of members. The agency director, or a higher State authority, must appoint members to the advisory committee on a rotating and continuous basis.
 
 
 27
 (d) Committee membership. The committee must include--
 
 
 28
 (1) Board-certified physicians and other representatives of the health professions who are familiar with the medical needs of low-income population groups and with the resources available and required for their care;(2) Members of consumers' groups, including Medicaid recipients, and consumer organizations such as labor unions, cooperatives, consumer-sponsored prepaid group practice plans, and others; and
 
 
 29
 (3) The director of the public welfare department or the public health department, whichever does not head the Medicaid agency.
 
 
 30
 (e) Committee participation. The committee must have opportunity for participation in policy development and program administration, including furthering the participation of recipient members in the agency program.
 
 
 31
 (f) Committee staff assistance and financial help. The agency must provide the committee with--
 
 
 32
 (1) Staff assistance from the agency and independent technical assistance as needed to enable it to make effective recommendations; and
 
 
 33
 (2) Financial arrangements, if necessary, to make possible the participation of recipient members.
 
 
 34
 (g) Federal financial participation. FFP is available at 50 percent in expenditures for the committee's activities.
 
 
 
 [1]
 The defendant, Director of the Rhode Island Department of Social and Rehabilitative Services, has not cross-appealed from the parts of the order granting preliminary relief to plaintiffs
 
 
 [2]
 These reductions apply only to persons who are "medically needy," i.e., those with somewhat greater financial resources than persons classified as "categorically needy." See Schweiker v. Hogan, --- U.S. ----, ----, 102 S.Ct. 2597, 2600, 72 L.Ed.2d ---- (1982). Plaintiffs do not argue that the Social Security Act or regulations thereunder contain substantive provisions which would make these cuts unlawful
 
 
 [3]
 In addition to funding reductions, OBRA gave the states more flexibility in designing their assistance programs for the "medically needy." See, e.g., OBRA § 2171, 95 Stat. 807-08
 
 
 [4]
 The complete text of the regulation, 42 C.F.R. § 431.12, appears as an appendix to this opinion
 
 
 [5]
 Because the district court granted a temporary restraining order, the rules did not actually go into effect until mid-May
 
 
 [6]
 The court in Morabito v. Blum, supra, recognized that the question of relief is a difficult one. The status quo ante cannot be restored; the most that can be ordered is that the state agency reconsider its decision after consultation with the committee. But cf. Budnicki v. Beal, 450 F.Supp. 546, 556 (E.D.Pa.1978) (failure to consult with the MCAC would necessitate voiding changes) (dictum)
 
 
 [7]
 We therefore do not reach the question of whether a qualifying group practice plan may be represented on the committee by one of its administrators, or whether an actual user of the plan must be on the committee
 
 
 [8]
 The record does not provide enough information about the Foundation for us to determine whether it may nonetheless properly be considered a "consumer organization."
 
 
 [9]
 We do not hold that any specific number or percentage of such representatives need be present on the committee. Cf. Dominguez v. Milliken, (1974 Transfer Binder) Medicare & Medicaid Guide (CCH) P 26,633 (W.D.Mich. Mar. 19, 1973); Addison v. Holliday, (1979-1 Transfer Binder) Medicare & Medicaid Guide (CCH) P 29,407 (N.D.Miss. Oct. 5, 1978)
 
 
 [10]
 While the record does not indicate when the MCAC was originally formed, there is no indication that it was not in existence prior to the present controversy
 
 
 [11]
 We note again that the MCAC's role is advisory only. See page 599-600, supra
 
 
 [12]
 We of course anticipate that an MCAC constituted in accordance with this opinion will be consulted should the need arise in the future
 
 
 [13]
 These changes included continuing payment for eye exams; increasing the number of covered hospital days per year; and certain changes in prescription drug coverage